UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY GRECH,                          Case No. 08-10729

        Plaintiff,               John Corbett O'Meara
vs.                                      United States District Judge

FORD MOTOR COMPANY,                      Michael Hluchaniuk
                                         United States Magistrate Judge

        Defendant.
_____/

**REPORT AND RECOMMENDATION
DEFENDANT'S MOTION FOR JUDGMENT ON
ADMINISTRATIVE RECORD (Dkt. 74); PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT (Dkt. 93)**

## I.   PROCEDURAL HISTORY

*Pro se* plaintiff, Kimberly Grech, initially filed her complaint in this matter

on February 21, 2008.  (Dkt. 1).  The complaint was amended once (Dkt. 26) and

it has been answered by defendant Ford Motor Company.  (Dkt. 30).  District

Judge John Corbett O'Meara referred this matter to the undersigned for all pretrial

proceedings.  (Dkt. 32).  The amended complaint alleges that defendant violated

various provisions of the Employee Retirement Income Security Act, the

Americans With Disabilities Act, the Family and Medical Leave Act, and Title

VII/Rehabilitation Act. (Dkt. 26).  Defendant filed a motion to dismiss and a

motion for judgment on the administrative record.  (Dkt. 59, 74).  The undersigned recommended that defendant's motion to dismiss be granted with respect to all of plaintiff's non-ERISA claims, which was adopted by Judge O'Meara.  (Dkt. 122, 127).  Plaintiff filed a response to defendant's motion for judgment on the record, which also will be treated as a cross-motion for summary judgment on plaintiff's claim under § 510 of ERISA, 29 U.S.C. § 1140.  (Dkt. 93).  Defendant filed a reply, which substantively addressed plaintiff's claims under § 510.  (Dkt. 95). Defendant's motion for judgment on the administrative record and plaintiff's cross-motion for summary judgment are now ready for report and recommendation.

For the reasons set forth below, the undersigned **RECOMMENDS** that the Court **GRANT** defendant's motion for judgment on the record and **DENY** plaintiff's motion for summary judgment.

## II.   STATEMENT OF FACTS

In general, the Disability Plan provides for three types of benefits that work together to provide eligible individuals with income during their disability: (1) short-term benefits at 100% of pay; (2) short-term benefits at 60% of pay; and (3) long-term benefits at 50% of pay.  (Dkt. 74, KGAPP0517-0518).  Short-term benefits at 100%-pay are paid through Ford's payroll services (on authorization

from UniCare, Ford's claim administrator).  Short-term benefits at 60%-pay and

long-term benefits at 50%-pay are paid by UniCare.  (Dkt. 74, KGAPP0521,

0524).  The level of benefits and the length of time an employee is eligible to

receive the benefits depends on various factors, including the employee's hire date

and years of Company service at the onset of the disability.  *Id.*  The Disability

Plan defines "service" and states that it is "measured from . . . the employee's hire

. . . date to the day before [the employee's] disability began." (Dkt. 74,

KGAPP0514).  And "disability" is defined as the "condition that prevents the

Employee from working due to an accident [or] illness. . . ."  (Dkt. 74,

KGAPP0512).

Plaintiff was hired as a GSR employee on October 13, 1997, and remained a

GSR employee until she retired effective February 1, 2008.  (Dkt. 74,

KGAPP0638).  In 2006, plaintiff requested and received a series of leaves of

absence for various medical conditions, including elevated enzyme levels related

to a then-undiagnosed condition, a broken ankle, and an unspecified seizure

condition.  (Dkt. 74, KGAPP0625-0634, 0557-0565).  In 2006, plaintiff was on

three medical leaves per her physicians' requests and received benefits under the

2006 Plan as follows:

- February 16, 2006 - May 8, 2006 (short-term benefits at 100% pay)

- July 10, 2006 - July 31, 2006 (short-term benefits at 100% & 60% pay)

- December 6, 2006 - December 15, 2006 (short-term benefits at 60% pay)

(Dkt. 74, KGAPP0517-0518, 0521, 0524.)

Toward the end of her December medical leave, plaintiff submitted documentation from her personal physician indicating that she could return to work on December 15, 2006. (Dkt. 74, KGAPP0633-0634). The Company Medical Department closed plaintiff's medical leave accordingly, and she stopped receiving disability benefits and was returned to the active payroll. (Dkt. 74, KGAPP0533-0546, 0557-0565, 0588-0589). The Company Medical Director then placed plaintiff on a fully-paid Administrative Leave pending the outcome of a medical evaluation as a result of issues that had come to light during plaintiff's medical leave. *Id*.

While plaintiff was out on her December disability leave, several of her coworkers had come forward with various complaints about her odd behavior in the workplace. (Dkt. 74, KGAPP0589). For example, plaintiff's coworkers reported that plaintiff displayed physical behavior that concerned them, such as rocking her body while grabbing her head and stating that "she cannot take this

anymore," and that she engaged in other unusual behavior such as spending significant portions of her workday monitoring the electronic calendars of various employees whom she claimed were meeting to "talk about her," and continuously monitoring her own electronic personnel information.  Plaintiff's coworkers also reported that most interactions with plaintiff resulted in friction that led to plaintiff discussing her medical problems and/or claiming that people were scheming against her.  *Id*.  These reports, in addition to the problems and difficulties the Medical Department had witnessed first-hand in dealing with plaintiff, led Company Medical Director, Dr. William Heckman, to conclude that a medical evaluation was warranted to determine whether plaintiff was able to return work from a mental health standpoint.  *Id*.  Plaintiff attended the medical evaluation on January 5, 2007, and the medical examiner found that plaintiff had the mental and emotional capacity to return to work.  (Dkt. 74, KGAPP0598).  During the Administrative leave, plaintiff remained on the salaried payroll and received her full wages. (Dkt. 74, KGAPP0533-0546, 0554-0555, 0557-0565, 0588-0589).  Plaintiff did not receive any disability benefits during the administrative leave.  *Id*.

Plaintiff returned to work from January 9, 2007 until January 18, 2007. (Dkt. 74, KGAPP0533-0546, 0557-0565).  After that time, plaintiff was placed on a no-work-available leave as a result of extensive medical restrictions that

prohibited her from doing her job with or without reasonable accommodation. (Dkt. 74, KGAPP0008). According to defendant, plaintiff's January 19, 2007 leave established a new disability claim under the 2007 Disability Plan because plaintiff had made an "effective return to work" from her December 2006 leave by being on the salaried payroll and not receiving disability benefits of any kind for a 30 day period. (Dkt. 74, KGAPP0512, 0533-0546, 0557-0565).

Plaintiff remained on leave for the next six months, from January 19, 2007 through July 18, 2007, during which time she received short-term disability benefits (at 100% pay and then at 60% pay) in accordance with the 2007 Plan. (Dkt. 74, KGAPP0517-0518, 0521, 0524, 0533-0546, 0557-0565). In July 2007, Ford found a job for plaintiff within her medical restrictions, and plaintiff returned to work for a few hours on July 19 and 20, 2007. (Dkt. 74, KGAPP0607). Plaintiff left a few hours into her second day, however, after an episode where she began uncontrollably screaming and banging on the desk so loudly that it could be heard throughout the floor. (Dkt. 74, KGAPP0612). Following her screaming episode, plaintiff refused to see the company physician and left the workplace. According to defendant, plaintiff's less than two-day return to work did not constitute an "effective return to work" under the Plan, and consequently her return to leave on July 21, 2007, was a continuation of her January 2007 disability

claim.  (Dkt. 74, KGAPP0512).

She subsequently presented a note from her treating physician reiterating her prior restrictions and recommending additional restrictions allowing plaintiff to work in a separate room with dim lighting and a humidifier.  (Dkt. 74, KGAPP0616).[1]  Plaintiff also told the company medical director that her restrictions should be interpreted as requiring that plaintiff be provided with agendas and a list of attendees prior to all work-related meetings and that unexpected meeting participants be precluded from attending meetings with her. As a result, plaintiff was again placed on "no work available" leave as a result of her inability to work, and she resumed receiving short-term disability benefits at 60%-pay.  (Dkt. 74, KGAPP0557-0565.)

Plaintiff continued receiving short-term disability benefits (at 60%-pay)

---

[1]  Plaintiff's medical restrictions prohibited her from walking more than a half block 2-3 times per day, required her to sit for a maximum of eight hours with frequent 15 minute breaks, and prohibited her from climbing more than one flight of stairs per day. These restrictions were among others that had been previously issued (e.g., no continuous standing greater than 10 minutes at a time, etc.).  (Dkt. 74, KGAPP0595, 0596, 0635-0637).  The company physician reviewed plaintiff's work location and determined that she was unable to perform her job with her restrictions, given that the conference rooms, rest rooms, cafeteria, and coworkers were all at various distances from her work station, and she would be required to enter and exit the building from the parking lot – the combination of which would require her to walk in excess of her restrictions.

from July 21, 2007 until she transitioned to long-term benefits at 50% pay on January 28, 2008.  (Dkt. 74, KGAPP0517-0518, 0521-0524, 0557-0565).  On February 1, 2008, plaintiff retired under the terms of a disability retirement under Ford's General Retirement Plan.  (Dkt. 74, KGAPP0323, 0638).  In addition to her disability retirement pension, plaintiff continues to receive long-term disability payments at 50%-pay.  According to defendant, she will continue to do so until those benefits expire in May 2016 pursuant to the terms of the 2007 Disability Plan (i.e., plaintiff's length of service less 12 months).  (Dkt. 74).

The Disability Plan uses a third party, UniCare, to administer disability claims under the Disability Plan.  (Dkt. 74, KGAPP0512, 0517).  On August 30, 2007 and November 9, 2007, UniCare addressed various questions plaintiff had raised in connection with her disability benefits, including, her claims that the 2006 Plan should apply to her claims, that she should receive benefits until age 65, and that a one-week waiting period was improperly applied to her December 2006 claim.  UniCare determined that plaintiff's disability benefits were properly administered and paid.  *Id.*

If an employee disagrees with a decision made by UniCare, the Disability Plan states that the employee may submit a written request for reconsideration of the claim within 180 days after the initial denial.  (Dkt. 74, KGAPP0528).

Although plaintiff did not file a timely appeal, the Salaried Disability Plan Committee, accepted her appeal for consideration.  (Dkt. 74, KGAPP0001). Other ERISA-plan issues were raised in the context of plaintiff requesting confirmation that she has been treated appropriately under the Plan (e.g., requesting that she receive "full service" under the General Retirement Plan or that the Company provide appropriate matching contributions under the Savings and Stock Investment Plan).  *Id*.  According to defendant, plaintiff did not identify or explain how these Plans were purportedly being violated and did not follow the established GRP and SSIP procedures in filing and appealing claims (e.g., by first requesting resolution or explanation from Fidelity Management Trust Company, which provides administrative services for the SSIP).  According to defendant, in order to provide a comprehensive and final resolution to all her pending benefits issues, the Retirement Committee and Administration Committee (for the SSIP) agreed to consider those aspects of her appeal.

On August 28, 2008, plaintiff filed her amended complaint which included an ERISA claim alleging that she has been improperly denied benefits under Ford's Disability Plan.  At the time she filed her amended complaint, plaintiff had not exhausted her internal remedies by receiving a decision from Ford's plan administrator (e.g., the various Committees).  (Dkt. 74, KGAPP0001).  On

October 27, 2008, the Retirement Committee, Administration Committee and

Salaried Disability Plan Committee issued their decisions denying plaintiff's

appeal and confirming that plaintiff's benefits have been and continue to be

properly administered.  (Dkt. 74, KGAPP0003-0016.)

## III.   DISCUSSION

### A.    Standards of Review

#### 1.    Claims for ERISA benefits

This Court reviews the denial of benefits under a *de novo* standard of review

"unless the benefit plan gives the administrator or fiduciary discretionary authority

to determine eligibility for benefits or to construe the terms of the plan."

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  However, when

a plan affords discretion to an administrator or fiduciary, the arbitrary and

capricious standard of review applies.  *Marks v. Newcourt Credit Group, Inc.*, 342

F.3d 444, 456 (6th Cir. 2003).  Under this standard, the decision must be affirmed

if it was "'rational in light of the plan's provisions.'"  *Id.* at 456-57, quoting,

*Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir.

1998).  Stated differently, "when it is possible to offer a reasoned explanation,

based on the evidence, for a particular outcome, that outcome is not arbitrary or

capricious."  *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693

(6th Cir. 1989) (internal quotations and citation omitted).  When a trial court

conducts a review in an ERISA case, the review is limited to the evidence that was

included in the record on which the administrator based its decision.  *Wulf v.*

*Quantum Chemical Corp.*, 26 F.3d 1368, 1376 (6th Cir. 1994);  *Perry v. Simplicity*

*Engineering*, 900 F.2d 963, 966 (6th Cir. 1990).

Sections 7.07 and 8.07 of defendant's 2006 and 2007 Salaried Disability

Plan, respectively, provide that the Plan Administrator "shall have the

discretionary authority to grant or deny Benefits under [the] Plan."  (Dkt. 74,

KGAPP0501, 0526).  The undersigned is persuaded that the language included in

the Plan unambiguously afforded the plan administrator with discretionary

authority to determine eligibility for benefits.  Therefore, the undersigned will

review plaintiff's benefit claims under the arbitrary and capricious standard of

review.

### 2.    Summary Judgment

Summary judgment is appropriate under Rule 56(b) "if the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as

a matter of law."  Fed.R.Civ.P. 56(c).  In *Copeland v. Machulis*, 57 F.3d 476, 478-

79 (6th Cir. 1995), the court stated the standard for deciding a motion for summary

Report and Recommendation
Cross-Motions for Judgment
*Grech v. Ford Motor Company;* 08-10729

judgment:

> The moving party bears the initial burden of establishing
> an absence of evidence to support the nonmoving party's
> case.  Once the moving party has met its burden of
> production, the non-moving party cannot rest on its
> pleadings, but must present significant probative
> evidence in support of the complaint to defeat the motion
> for summary judgment.  The mere existence of a scintilla
> of evidence to support plaintiff's position will be
> insufficient; there must be evidence on which the jury
> could reasonably find for the plaintiff.

A genuine issue of material fact exists only when, assuming the truth of the non-

moving party's evidence and construing all inferences from that evidence in the

light most favorable to the non-moving party, there is sufficient evidence for a

trier of fact to find for the non-moving party.  *Ciminillo v. Streicher*, 434 F.3d 461,

464 (6th Cir. 2006).

"In deciding a motion for summary judgment, [the] court views the factual

evidence and draws all reasonable inferences in favor of the nonmoving party."

*McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  This is not to

say that some credibility determinations are beyond what is appropriate in

deciding a motion for summary judgment.  "When opposing parties tell two

different stories, one of which is blatantly contradicted by the record, so that no

reasonable jury could believe it, a court should not adopt that version of the facts

for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1774, 1776 (2007).

Rule 56 limits the materials the Court may consider in deciding a motion under the rule: "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995) (citation omitted). Moreover, affidavits must meet certain requirements:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

Fed.R.Civ.P. 56(e)(1). In accordance with Rule 56(e), the Sixth Circuit has held "that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded." *Moore v. Holbrook,* 2 F.3d 697, 699 (6th Cir. 1993). Thus, in resolving a Rule 56 motion, the Court should not consider unsworn or uncertified documents, *Id.*, unsworn statements, *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968-969 (6th Cir. 1991), inadmissible expert testimony, *North American Specialty Ins. Co.*

*v. Myers*, 111 F.3d 1273, 1280 (6th Cir. 1997), or hearsay evidence, *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996); *Wiley v. United States*, 20 F.3d 222, 225-226 (6th Cir. 1994).  Thus, "[a] party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact."  *Id*., quoting, *Sperle v. Michigan Dept. of Corrections*, 297 F.3d 483, 495 (6th Cir. 2002) (citation and quotation marks omitted).

    B.    <u>Analysis and Conclusions</u>

        1.    "Total Benefits Limit"

Plaintiff asserts that she is entitled to defendant's "Total Benefit Limit" because:  (1) she did not make an effective return to work in December of 2006; and (2) she was on long term disability in 2006.  The Total Benefit Limit, as described in defendant's 2006 Plan, provides that employees may receive 65-75% of Pay, which is calculated using income from *all* sources (i.e., social security, disability benefits, etc.).  (Dkt. 74, KGAPP0498).  The Total Benefits Limit was, however, excluded from the 2007 Plan, which was effective on January 1, 2007.

Defendant submits that plaintiff made an effective return to work in January 2007, and plaintiff's disability claim is, therefore, governed by the 2007 Plan, which does not include the Total Benefits Limit.  Plaintiff, on the other hand, submits that she did not make an effective return to work, and her disability claim

is governed by the 2006 Plan.  The undersigned is unpersuaded by plaintiff's argument.

Both the 2006 and 2007 Plans define an Effective Return to Work similarly. An employee, after receiving STD benefits, must return to work as an Active Employee for more than one month.  (Dkt. 74, KGAPP0488, 0512).  An Active Employee is one who is actively at work the day prior to Disability and who is assigned to the salaried payroll including those on paid time off.  *Id.*

On December 6, 2006, plaintiff applied for, and received, STD benefits until December 14, 2006.  (Dkt. 74, KGAPP0562).  Plaintiff was then cleared to return to work with restrictions.  (Dkt. 74, KGAPP0634).  On December 15, 2006, defendant, in lieu of returning plaintiff to work, placed plaintiff on administrative leave for a medical evaluation by defendant's medical examiner, Dr. William Heckman.  (Dkt. 74, p. 13).  Plaintiff did not receive any STD benefits during the administrative leave; rather, plaintiff remained on defendant's salaried payroll. (Dkt. 74, KGAPP0555, 0562).  During this time, plaintiff was, according to the 2006 and 2007 Plans, an Active Employee.  On January 9, 2007, plaintiff physically returned to work.  (Dkt. 74).  Plaintiff remained at work for only a short time, as plaintiff subsequently applied for, and received, STD benefits on January 19, 2007.  (Dkt. 74, KGAPP0560).  Therefore, plaintiff's active employment status

Report and Recommendation
Cross-Motions for Judgment
*Grech v. Ford Motor Company;* 08-10729

lasted from December 15, 2006 until January 19, 2007. Contrary to plaintiff's assertion, plaintiff did, in fact, make an effective return to work following her December 6, 2006 STD benefits claim, despite not being physically at work during the entire 35 day duration. Because plaintiff made an effective return to work, plaintiff's January 19, 2007 disability claim was a "new claim," and was, therefore, governed by the 2007 Disability Benefits Plan, which did not include the Total Benefits Limit.

Even if plaintiff did not make an effective return to work, as she contends, plaintiff's disability benefits would still not be calculated using the Total Benefits Limit. The 2007 Plan states, in part:

> A Participant with a last date of work in the calendar year 2006 or earlier, who is receiving Short-term Benefits at 100% of Pay or Short-term Benefits at 60% of Pay and income from other income sources . . ., will cease eligibility for the Total Benefit Limit described in [the 2006] Salaried Disability Plan, effective the date of eligibility for Long-term Benefits at 50%.

(Dkt. 74, KGAPP0518). According to defendant, this provision means that the Total Benefit Limit was eliminated for any employee with a last date of work in 2006 (or before) who had not transitioned to long-term disability benefits by January 1, 2007. (Dkt. 74, KGAPP0511, 0518). Defendant further explains that plaintiff never transitioned to LTD benefits in 2006. According to defendant,

plaintiff began receiving short-term benefits at 60%-pay during her July 2006 medical leave (she received this benefit from July 13 – July 31, 2006) (i.e., 18 days). (Dkt. 74, KGAPP0563). Plaintiff resumed receipt of 60%-pay short-term benefits when she started her December 2006 leave and received them from December 5 – December 14, 2006 (i.e., nine days). (Dkt. 74, KGAPP0517-0518, 0562). As set forth in both the 2006 and 2007 Plans, the duration for short-term benefits at 60%-pay is 9 months. (Dkt. 74, KGAPP0517-0518, 0521, 0524). Thus, defendant asserts that plaintiff was far from transitioning to long-term benefits in December 2006, and would not have exhausted the short-term 60% benefits even if she had remained on leave through the end of December. *Id.* Accordingly, pursuant to the terms of the plan, the Total Benefit Limit could not apply to plaintiff even if her last day worked was in December 2006, rather than January 2007. (Dkt. 74, KGAPP0009-0010, 0012-0013).

Based on the foregoing, the undersigned suggests that the decision of the benefits committee, that plaintiff was not covered by the Total Benefit Limit, was well-reasoned, supported by the record evidence and was, therefore, not arbitrary and capricious.

2.      Defendant's denial of plaintiff's disability benefits until age 65

Plaintiff claims that defendant incorrectly or fraudulently determined that

her disability benefits would not continue until she reached age 65.  Plaintiff relies on a March 2007 email from the defendant's National Employment Services Center (NESC) indicating that plaintiff would achieve 10 years of service in October 2007.  (Dkt. 74, KGAPP0010, 0440, 0459).  However, in September of 2007, defendant sent plaintiff an email explaining, that plaintiff was not eligible for disability benefits until age 65 based on her status at that time.  (Dkt. 94, p. 9).

According to defendant, the pertinent language in defendant's 2006 and 2007 Disability Plan is identical with respect to this issue.  (Dkt. 74, KGAPP 0495, 0521).  In essence, whether and how long an employee is eligible for LTD benefits at 50% of pay are determined by, among other things, length of service at the time the disability occurred.  *Id.*  Employees with six months to 10 years of service are eligible for LTD benefits for their length of service less twelve months. *Id.*  Employees with more than 10 years of service are eligible for LTD benefits until the employee reaches age 65.  *Id.*  Service, as defined in the Plan, is not the same as the length of time an employee is employed; rather, "Service" is calculated using the employees hire (or rehire) date and the day before the employee's disability began.  (Dkt. 74, KGAPP 0490, 0514).  Disability is defined as "the condition . . . that prevents the Employee from working . . . ." (Dkt. 74, KGAPP0512).  Plaintiff was hired October 13, 1997.  (Dkt. 74, KGAPP0638).

Plaintiff's disability began on January 19, 2007 when she was unable to work due to her medical conditions and restrictions and was subsequently unable to make an effective return to work. (Dkt. 74, KGAPP0638). On January 18, 2007, the day before her disability began, plaintiff did not have the requisite 10 years of service to entitle her to benefits to age 65. *Id*.[2] (Dkt. 74, p. 14). Therefore, plaintiff had approximately nine years and three months of "Service" with defendant. Plaintiff did not acquire 10 years of Service with defendant, and was, therefore, not eligible for LTD benefits until age 65.

Based on the foregoing, the undersigned is persuaded that defendant denial of plaintiff's benefits until age 65 was well-reasoned, supported by the record evidence and was, therefore, not arbitrary and capricious.

### 3.   Plaintiff's December 6, 2006 disability claim

Plaintiff alleges that her Short-term Disability benefit payments from her December 6, 2006 disability claim were improperly or "fraudulently" delayed by one week. (CITE). Section 4.03(iii) of the defendant's 2006 Disability Plan, in

---

[2] Defendant asserts that because plaintiff did not make an effective return to work in July of 2007, plaintiff's last day of employment was January 18, 2007. Even if plaintiff had made an effective return to work in July, 2007, she still had not achieved 10 years of service given that she again stopped working in July, 2007. (Dkt. 74, KGAPP0607).

part, provides: "If all of the . . . Short-term benefits at 100% of Pay have been used in a given benefit year and the Participant is filing a new claim, Short-term Benefits at 60% of Pay *will start on the eighth day of Disability*."  (Dkt. 74, KGAPP0493) (emphasis added).

General Salary Roll employees, hired by defendant before June 1, 2003, are eligible for 63 workdays[3] of Short-term Benefits at 100% of Pay, regardless of years of service.  (Dkt. 74, p. 11).  Section 4.04 of the 2006 Disability Plan provides that Short-term Benefits at 100% of pay are "renewable at the beginning of each year, for Participants actively at work . . . at the start of a calendar year" provided, however, that the employee "has made an Effective Return to Work following a prior Disability claim."  (Dkt. 74, KGAPP0493).  In sum, the 63 days of disability benefits at 100% of pay are renewable at the start of the calendar year. However, the employee must work full-time for at least one month to be eligible for the renewal.

On February 16, 2006, plaintiff applied for, and received, short-term disability benefits at 100% of pay until May 8, 2006.  Therefore, plaintiff

---

[3] The calculation of Short-term Benefits at 100% of pay includes 21 days of Salary Continuation Benefits (100% of pay) and 42 days of Short-term Benefits at 100% of pay.  The Court will refer to the combination of these two benefits as Short-term Benefits at 100% of pay.

exhausted 58 of the available 63 short-term disability benefits at 100% of pay.  On July 10, 2006, plaintiff again applied for, and received, short-term disability benefits at 100% of pay.  (Dkt. 74, KGAPP0016, 0517-0518, 0536).  Plaintiff exhausted the remaining five days of short-term disability benefits at 100% of pay on or about July 14, 2006, and subsequently began receiving short-term disability benefits at 60% of pay until July 31, 2006.  (Dkt. 74, KGAPP0010).  Plaintiff returned to work on July 31, 2006, and on August 31, 2006, plaintiff made an effective return to work by working full-time for thirty days.  On December 6, 2006, plaintiff applied for the disability benefits in question; however, plaintiff had no remaining short-term disability benefits at 100% pay available for the 2006 calendar year.  *Id.*  Because plaintiff had made an effective return to work on or about August 31, 2006, plaintiff's December 6, 2006 disability claim was a "new claim."  Having exhausted all short-term disability benefits at 100% of pay and filing a new disability claim, plaintiff's December 6, 2006 disability benefits were properly administered on the eighth day of plaintiff's disability.  This procedure was explained, in full, by defendant's claim processor, UniCare, in a letter dated August 30, 2007.  (Dkt. 74, KGAPP0547).

Based on the foregoing, the undersigned suggests that defendant's conclusion that plaintiff was not entitled to STD benefits until the eighth day of

disability in December 2006 was well-reasoned, supported by the record evidence

and was, therefore, not arbitrary and capricious.

> 4.    Calculation of plaintiff's pension under the General Retirement
>        Plan

In her administrative appeal, plaintiff requested that she: (1) receive "full

service points total[ing] 10 or more years of service" under the General Retirement

Plan; (2) that defendant use her annual salary of $89,420 ($7,451.68 per month)

for purposes of calculating her monthly benefit; (3) that defendant "apply

plaintiff's pension contributions for 2007 and 2008, up until the time of plaintiff's

Disability Retirement [on 2/1/08]"; (4) that defendant generate and deposit her

checks in a timely manner; and (5) be paid for her 2008 vacation pay.  (Dkt. 74,

KGAPP0004-6).

According to defendant, the General Retirement Plan defines "service"

differently than the Disability Plan, and provides that an individual accrues service

while they are an "employee."  (Dkt. 74, KGAPP0054).  Plaintiff was an employee

from October 13, 1997 until her February 1, 2008 retirement.  (Dkt. 74,

KGAPP0638).  Thus, defendant explains, the Retirement Committee concluded

that plaintiff's pension benefit calculation was correctly based on 10.4 years of

service.  (Dkt. 74, KGAPP0004-0006, 0320-0325).  The undersigned agrees that

defendant's decision regarding the calculation of plaintiff's years of service is supported by the plan documents and the record evidence. Plaintiff points to nothing in the record that would render defendant's decision arbitrary and capricious.

The Retirement Committee also concluded that plaintiff's pension calculation correctly used the salary ($7,451.68 per month) that plaintiff requested for purposes of calculating her benefit. (Dkt. 74, KGAPP0052-0053, 0057). The parties appear to be in agreement regarding the salary number that should be used for purposes of calculating the pension benefit. Plaintiff does not specifically address this issue in her response to defendant's motion for judgment on the record. Thus, the undersigned finds nothing arbitrary and capricious about defendant's decision.

The Committee concluded that plaintiff's pension contributions were appropriately applied in 2007 and 2008. The General Retirement Plan provides for several types of retirement benefits, including Non-Contributory (flat-rate), and Contributory (pay-related) benefits. (Dkt. 74, KGAPP0058-0060). The Committee explained in its decision that employees automatically participate in the Non-Contributory part of the Plan, but must elect to participate in the Contributory portion of the Plan. (Dkt. 74, KGAPP0053, 0059). Employees who

want to make contributions must enroll and then the contributions are deducted from employees' month-end payroll check.  (Dkt. 17, KGAPP0004-0005).  If an employee is not receiving a check from Ford Motor Company, the employee cannot contribute.  *Id.*  Thus, the Retirement Committee concluded that contributions cannot be taken from employees when they are being paid by UniCare (short-term disability benefits at 60% pay and long-term disability benefits at 50% pay).  *Id.*  With respect to 2007, the Retirement Committee concluded that plaintiff contributed to the General Retirement Plan when she received checks issued from Ford during January 2007 through April 2007 time period, and on July 31, 2007. (Dkt. 74, KGAPP0004-0005, 0320-0325). According to the records relied on by the Retirement Committee, plaintiff had no other General Retirement Plan contributions in 2007 or 2008 because she was not receiving a check from Ford at those times and was being paid by UniCare.  (Dkt. 74, KGAPP0057-0065).  Plaintiff points to no evidence in the record to suggest that the conclusions reached by the Retirement Committee were arbitrary and capricious.  Thus, the undersigned finds no basis to disturb this decision.

Finally, the Retirement Committee also concluded that plaintiff had been appropriately and timely paid her disability pension since the time that her retirement was processed and approved.  Plaintiff applied for a disability

retirement to commence on February 1, 2008. (Dkt. 74, KGAPP0005, 0320-0325). Her retirement was approved by the Ford Medical Department on April 7, 2008, and her first retirement check was issued on May 15, 2008, which included payments retroactive from February 1, 2008. *Id.* Since that time, according to the Retirement Committee, her checks have been processed in a timely and appropriate manner since her retirement was processed and approved. *Id*. Plaintiff does not address this issue in her response brief and, therefore, the undersigned finds no basis to disturb the decision of defendant, which appears well-reasoned and based on evidence in the record.

Finally, with respect to plaintiff's claim that she was not paid for all of her sick leave in 2008, neither party addressed the substance of this issue in their briefs and thus, the undersigned finds no basis to disturb the decision below.

> 5.    Administration of deferrals under the Savings and Stock Investment Plan

Plaintiff claims that, in 2007 and 2008, defendant improperly precluded her from deferring portions of her salary to the Savings and Stock Investment Plan (a plan under § 404(c) of ERISA), which allows eligible employees to make pre-tax payroll contributions to a savings and investment program, and at times, provides Company matching contributions. Plaintiff also requests that defendant provide

matching contributions to plaintiff's 2007 and 2008 SSIP contributions. Participation in Ford's SSIP is voluntary and eligible employees must elect to make contributions. (Dkt. 74, KGAPP0332-0335). At certain times, eligible employees who contribute to the SSIP are eligible for Company matching contributions. (Dkt. 74, KGAPP0339-0343). Company matching contributions, however, were suspended from July 1, 2005 through May 31, 2007. (Dkt. 74, KGAPP0339). As with the General Retirement Plan, employee contributions cease once an employee no longer receives a Ford paycheck. (Dkt. 74, KGAPP0388). Consequently, when an employee is being paid by UniCare (short-term benefits at 60% or long-term benefits at 50%), the employee cannot contribute to the SSIP. (Dkt. 74, KGAPP0007).

The SSIP Administration Committee reviewed plaintiff's SSIP deferral elections and found that plaintiff made an affirmative election to: 1) cancel her SSIP pre-tax deferral rate of 5% on November 27, 2005; and 2) re-enroll in the SSIP at a pre-tax deferral rate of 10% on August 6, 2007. (Dkt. 74, KGAPP0408-0409). Thus, plaintiff's elected deferral rate from January through August 2007 was zero. *Id.* Although plaintiff re-enrolled in the SSIP in August 2007, plaintiff was not being paid by Ford at that time (she was receiving disability benefits from UniCare), and plaintiff never returned to work after she

re-enrolled in the SSIP on August 6, 2007.  (Dkt. 74, KGAPP0057-0565).

Accordingly, the Committee concluded that plaintiff was not improperly precluded

from making contributions to the SSIP in 2007 and 2008, and she was not owed

any additional matching contributions.  *Id*.

Plaintiff asserts that defendant failed to properly apply her SSIP

contribution from December 2006 to the present because it "inactivated" her

contribution and would not allow her to reinstate them.  (Dkt. 93, p. 33).  Plaintiff

does not, however, point to any evidence in the record to support her claim.  This

stands in stark contrast to defendant's reliance on the language of the plan

documents and other record evidence.  Thus, the undersigned finds no basis to

disturb the decision below or find that it was arbitrary and capricious in any

respect.

      6.    Section 510 discrimination claim

Section 510 prohibits two types of conduct: adverse action taken because a

participant availed himself of an ERISA right (an "exercise" or "retaliation"

violation), and interference with the attainment of a right under ERISA (an

"interference" violation).  *Barnum*, at \*12, citing, *Coomer*, 370 F.3d at 506; *Mattei

v. Mattei*, 126 F.3d 794, 797 n. 4 (6th Cir. 1997).  Plaintiff asserts that defendant

interfered with her ability and right to obtain certain ERISA benefits in violation

of 29 U.S.C. § 1140 provides, which provides in part that:

> It shall be unlawful for any person to discharge, fine,
> suspend, expel, discipline, or discriminate against a
> participant or beneficiary for exercising any right to
> which he is entitled under the provisions of an employee
> benefit plan, this title, section 3001, or the Welfare and
> Pension Plans Disclosure Act, or for the purpose of
> interfering with the attainment of any right to which such
> participant may become entitled under the plan, this title,
> or the Welfare and Pension Plans Disclosure Act.

Plaintiff's claims under § 510 are evaluated under the summary judgment

standard. *Barnum v. Bakery, Confectioners, Tobacco Workers and Grain Millers*

*Int'l Union*, 2007 WL 1683814 (S.D. Ohio 2007), citing, *Coomer v. Bethesda*

*Hosp., Inc.*, 370 F.3d 499, 506 (6th Cir. 2004); *Majewski v. Automatic Data*

*Processing, Inc.*, 274 F.3d 1106, 1113 (6th Cir. 2001).

The Sixth Circuit has noted that this "provision of ERISA is 'aimed

primarily at preventing unscrupulous employers from discharging or harassing

their employees in order to keep them from obtaining vested pension rights.'"

*Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 455 (6th Cir. 2003), quoting,

*West v. Butler*, 621 F.2d 240, 245 (6th Cir. 1980). In *Marks*, the plaintiff alleged

that the defendant had fraudulently induced him to alter his employment situation

in a way that adversely affected his ability to claim benefits. The Sixth Circuit

noted that "false statements affecting an employee's pension rights do not rise to

the level of discrimination found in cases enforcing [§ 1140 ]." *Id*. at 455.

"To avoid summary judgment on a § 510 interference claim, 'an employee must show that the employer engaged in prohibited conduct for the purpose of interfering with the employee's attainment of any right to which he may become entitled under an ERISA-protected plan.'" *Coomer*, 370 F.3d at 506, quoting, *Roush v. Weastec, Inc.*, 96 F.3d 840, 845 (6th Cir. 1996). To establish a § 510 interference claim, plaintiff must present evidence showing that defendant "had the specific intent of avoiding ERISA liability" when it took the prohibited action. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1113 (6th Cir. 2001); *see also Abbott v. Pipefitters Local Union No. 522*, 94 F.3d 236, 242 (6th Cir. 1996) (plaintiff "must demonstrate that the action at issue was taken with the specific intent to violate ERISA, i.e., that a motivating factor in the defendant's action was the purpose of interfering with the plaintiff's entitlement to benefits"). Plaintiff can demonstrate "specific intent" through either direct evidence or through a burden shifting approach similar to that utilized in employment discrimination cases. *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997). In the absence of direct evidence of discriminatory intent, plaintiff must show the existence of "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become

entitled." *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992), quoting, *Gavalik v. Continental Can Co.*, 812 F.2d 834, 853 (3d Cir. 1987); *see also Smith*, 129 F.3d at 865.

Plaintiff must also show "a causal link between pension benefits and the adverse employment decision." *Smith*, 129 F.3d at 865 (citations omitted). Plaintiff must present evidence from which a reasonable jury could find that defendant's desire to avoid some ERISA benefit liability was a determining factor in its prohibited conduct. *Id.* In other words, in a § 510 interference claim, "the alleged illegal activity [must] have a causal connection to the plaintiff's ability to receive an identifiable benefit." *Mattei*, 126 F.3d at 808. If plaintiff states a *prima facie* case under § 510, defendant can rebut the presumption of impermissible action raised by the *prima facie* case by coming forward with "evidence of a legitimate, nondiscriminatory reason for its challenged action." *Smith*, 129 F.3d at 865. In this event, the burden then shifts back to plaintiff to show that defendant's proffered reason was a mere pretext. *Id.* While plaintiff "need not show that [defendant's] sole purpose ... was to interfere with [plaintiff's] entitlement to benefits," it must "either prove that the interference was a motivating factor in [defendant's] actions or prove that [defendant's] proffered reason is unworthy of credence." *Id.* (Citations and quotations omitted). If plaintiff fails to establish a

*prima facie* case or fail to rebut defendant's proffer of a legitimate, nondiscriminatory reason for its actions, summary judgment should be granted for defendant.

Plaintiff asserts several theories of § 510 retaliation or interference. First, she claims that after defendant confirmed that she would receive credit for 10 years of service, which would entitle her to disability benefits until age 65, "Ford then changed the Plaintiff's eligibility by 'voiding' the Plaintiff's 2007 Ford Flex elections and removing the Plaintiff's Accidental Death and Dismemberment Policy, which entitled the Plaintiff to an additional 50 months of Long-Term Disability payments at $20 per $1000 of coverage the Plaintiff had under the Plan." (Dkt. 93, p. 10, citing, Dkt. 92, KG-TRDOC-0001-2; 00183). Plaintiff asserts that defendant terminated her in December 2006 to avoid paying these benefits. (Dkt. 93, p. 12). According to defendant, Ms. Costew did not tell plaintiff that she had the requisite service to receive benefits until age 65. The e-mail plaintiff references, discusses the service necessary for a Disability Retirement, which is defined and calculated differently than "service" under the Disability Plan. Defendant further argues that plaintiff cannot claim that her "alleged misinterpretation of Ms. Costew's e-mail amended or superseded the plain language of the Disability Plan, which provides: a) that employees must have

10 or more years of service, and b) states that "service" is measured from the date of hire (10/13/1997) to the day before the employee's disability (i.e., the condition that prevents the employee from working) began (in Plaintiff's case, 1/18/07)." Dkt. 94, p. 3, citing, *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) (ERISA plan is not superseded or modified by employer's written representations where employer's statements did not profess to be plan amendments or suggest that plan was being modified.)).

As set forth above, the undersigned concludes that defendant's decision regarding the calculation of plaintiff's years of service is supported by the plan language and the record evidence.  The undersigned also agrees with defendant that plaintiff has misinterpreted a very clear email from one of defendant's employees, which, even if it could be read as plaintiff asserts, it could not operate to change the terms of the plan in accordance with *Sprague*.  Thus, the undersigned concludes that plaintiff has failed to identify any adverse employment action to support this particular theory of § 510 discrimination and her claim is without merit.

Next, plaintiff claims that defendant added "Current Hire Dates and Full Vesting Dates to prevent the Plaintiff from reaching eligibility for future benefits even though these violate the Plaintiff's General Retirement Plan (GRP) and

Disability eligibility under Ford's 2003 Disability Benefit Plan Rules where what was in effect for the Plaintiff according to Ford's Disability Manager Ms. Suzanne De Haan who supplied the Plaintiff with copies of the Policies that pertained to the Plaintiff's benefits June 29, 2007, July 6, 2007 and July 12, 2007." (Dkt. 93, p. 10, citing, Dkt. 92, KG-TRDOC-00519-21). According to defendant, this is a new theory never previously articulated by plaintiff. Defendant asserts that plaintiff's conclusion that her retirement benefits were calculated based on the wrong date – i.e., a "current new hire date of 5/8/06" is not supported by the record or common sense. (Dkt. 94, p. 6). Defendant points out that if plaintiff's retirement benefit was calculated based on a hire date of May 8, 2006, she would not have even been vested under the General Retirement Plan, let alone determined to have 10.4 years of credited service. The undersigned agrees that plaintiff's second theory is neither supported by any facts or evidence and simply makes no sense, given her years of credited service under the General Retirement Plan. Thus, the undersigned suggests that plaintiff's second § 510 discrimination theory also fails.

Finally, plaintiff asserts that she never made an effective return to work, which was a requirement to be in "Ford's 2007 Plan Rules," she was already full vested at five years of service and did not lose her reinstatement rights as outlined in defendant's documents and letter dated August 27, 2007, and that defendant has

refused to explain other discrepancies that she claims impacted her benefits.  (Dkt. 93, pp. 10-11; 13-14, citing, Dkt. 92, KG-TRDOC-00192-195; 330; 555; 540).[4] Defendant argues that, to the extent that plaintiff's § 510 claim appears to be a claim for benefits, they fall under § 502(a)(1)(b).  And, to the extent that plaintiff claims that she does not qualify for additional benefits under the various Ford plans, defendant argues that plaintiff has simply failed to establish a *prima facie* case under § 510.  Specifically, defendant asserts that plaintiff points to no adverse action taken by defendant that prevented plaintiff from fully vesting in her retirement benefits or obtaining any other benefits.  Rather, as plaintiff has admitted, her employment with Ford ceased when she was approved for a disability retirement for which she applied.  (Dkt. 94).  Defendant points out that the only claim made by plaintiff that arguably fits within the parameters of §510 is her claim that she would have been eligible for disability benefits until age 65 had she achieved 10 years of service as defined by the Disability Plan.  (Dkt. 94). Defendants admit that, while it is true, plaintiff cannot show that her failure to reach 10 years of service is the result of any adverse action taken by Ford.

---

[4] There is no document page number KG-TRDOC-00540 contained in Dkt. 92.  Plaintiff asserts that this document shows she is entitled to LTD benefits under the 2003 Disability Plan.  (Dkt. 93, p. 13).

According to defendant, its efforts to return her to work in July, 2007 would have helped her achieve that service goal, but she left work after less than two days and resumed her medical leave of absence.  (Dkt. 94, Ex. A).  To the extent that plaintiff's third theory of § 510 discrimination is even comprehensible, it appears to be another variation on theory number two and is equally unsupported by any evidence or grounded in any logic, given the years of service credited to plaintiff. Thus, the undersigned suggests that plaintiff's third theory of § 510 discrimination must fail.

## IV.   RECOMMENDATION

For the reasons set forth below, the undersigned **RECOMMENDS** that the Court **GRANT** defendant's motion for judgment on the record and **DENY** plaintiff's motion for summary judgment.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 10 days of service, as provided for in 28 U.S.C. § 636(b)(1) and Local Rule 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this

Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 10 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: September 11, 2009                    s/Michael Hluchaniuk
                                            Michael Hluchaniuk
                                            United States Magistrate Judge

## <u>CERTIFICATE OF SERVICE</u>

I certify that on <u>September 11, 2009</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to the following: <u>Shannon V. Loverich</u>, and I certify that I have mailed by United States Postal Service the paper to the following non-ECF participant: <u>Kimberly Grech, 56041 Birkdale, Macomb Township, MI 48042</u>.

s/James P. Peltier
Courtroom Deputy Clerk
U.S. District Court
600 Church Street
Flint, MI 48502
(810) 341-7850
pete_peltier@mied.uscourts.gov